UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CIVIL ACTION NO. 3:16-CV-511-TBR

JOHN BELDEN,                                                                               PLAINTIFF

v.

SCOTT JORDAN, *et al.*,                                                       DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant Ryan Ramey's Motion for Summary Judgment. [R. 38.] Plaintiff John Belden responded, [R. 41], and Ramey replied, [R. 58]. The Court granted Belden an extension to file an Amended Response by January 26, 2018 after viewing video footage of the incident that is the subject of this case. [R. 53.] On January 11, 2018, Belden viewed the video footage, [R. 58-1], but he has not filed an Amended Response. This matter is now ripe for adjudication. For the reasons stated herein, Ramey's Motion for Summary Judgment, [R. 38], is GRANTED.

**BACKGROUND**

The general facts of this case are described in the Court's prior opinion, *Belden v. Jordan et al.*, NO. 3:16-CV-P511, 2017 WL 119477 (W.D. Ky. January 11, 2017). Particularly important to the issue at hand is the altercation between Belden and Ramey. At the time of the incident, April 28, 2016, Belden was an inmate at Luther Lockett Correctional Complex and Ramey was a corrections officer. Belden stated in his verified Complaint that on that day, he was upset after discussing some bad news at the legal office, and Ramey overheard him venting to some friends. [R. 1 at 9-10, ¶ 13, 18 (Verified Complaint).] Belden told his friends that he wished he would have stayed at Kentucky State Penitentiary, ("KSP"), to which Ramey allegedly stated "Good! Go back to Eddyville . . . Go back, Go back, we're [tired] of you 'all'

1

comming [sic] here, Go back! I can make it happen!" [*Id*. at 11, ¶ 18, 21.] Ramey disputed Belden's account of this interaction. Ramey stated in his Affidavit that after Belden stated "'F**k this institution, I want to go back to KSP,' [he] told Inmate Belden that 'we can make that happen.'" [R. 38-2 at 1 (Ramey Affidavit).]

Belden recalled that after this comment, he became angry and distressed, so he hurried back to his dorm to collect himself. [R. 1 at 12, ¶ 25.] After realizing he left his ID card at the legal office, Belden left his dorm and saw Belden talking to Lt. Sarah Crawford. [*Id.*, ¶ 27.] Belden stated that he saw this as an opportunity for Crawford to mediate his issue with Ramey. [*Id*. at 12, ¶ 27.] Belden stated that he asked Crawford, "Maam' [sic], can you please…help me medate [sic] between me and him" to which Ramey allegedly responded by saying "Oh really! Oh really! What a bitch!" [*Id*.] Ramey's account is different. He stated that Belden asked to speak to Crawford, but not in front of Ramey, and Ramey responded by saying "something to the effect off—'are you serious, whatever.'" [R. 38-2 at 1.]

Belden stated that as Ramey was walking away, he said "now thats [sic] some rat . . . shit." [R. 1 at 13, ¶ 28.] Ramey denied this narrative. [R. 38-2 at 2.] Belden stated that he reacted by responding "This is fucked up, you been doing this all day." [R. 1 at 13, ¶ 30.] This caused Crawford to order Belden to allow her to restrain him with handcuffs, to which Belden averred that he complied. [*Id*.] Belden recalled that he then saw Ramey "sneering a sinister smile and quickly getting closer." [*Id*.] Belden stated that he "reacted under the intention [sic] infliction of emotional distress caused by and created ultimately by Defendant c/o Ramey the known 'Yard Bully'" and "[a] physical altercation insued [sic]" between them. [*Id*. at 14, ¶ 36-37.] Belden stated that the altercation ended in a "matter of seconds" with Ramey in a "top mounted position" on Belden and striking Belden in the face with his forearm. [*Id*. at ¶ 38.] Belden

averred that he stopped resisting but multiple unidentified officers rushed the scene and struck him in the face with their knees and fists, as well as pulled and kicked his arms. [*Id.*, ¶ 39-40.] Belden added that the unidentified responding officers "used knees to push [his] face into [the] ground and [his] upper body was push and pulled and weighted down" even though he was not resisting and he was "pinned down" by Ramey at the time. [*Id.* at 15, ¶ 42.]

Ramey remembered this incident differently. Ramey stated that he saw Belden jerk his shoulder "as if trying to get away from Lt. Crawford" when she tried to handcuff him, and he started to respond to help her when "Belden broke free of her grasp and charged toward [him]." [R. 38-2 at 2.] Ramey described the physical altercation as follows:

> Belden threw two quick punches that contacted me on the right side of my face. We struggled for a few seconds on our feet. I was then able to throw Inmate Belden to the ground, but in doing so I went down as well. We both struggled to gain control of the other by getting on top. Inmate Belden was able to get on top of me. While he was on top of me, I rolled Belden to the right and I gained top mounted position and pinned him to the ground. When I got on top of Inmate Belden, he wrapped his legs around me to hold me in position. Inmate Belden continued to struggle while I was on top of him. Finally, Inmate Belden stopped struggling when responding officers arrived and pinned his arms down.

[*Id.*] Crawford's account of the incident in her affidavit provides little detail to support the account of either party:

> Inmate Belden stated to me that Officer Ramey had been getting smart with him all day. Officer Ramey responded by saying something along the lines of "really man?" I told Officer Ramey to step back and I walked inmate Belden in the other direction to deescalate the situation. As I walked Inmate Belden away, he started to yell at Officer Ramey and said, "this is f**ked up, you know you have been taunting me." When Inmate Belden yelled at Officer Ramey I told Inmate Belden to cuff up. As I was about to place restraints on him he charged toward Officer Ramey hitting him multiple times. As Officer Ramey and Inmate Belden struggled I tried to help pull Inmate Belden off of Ramey. I was not successful. Other officers arrived. I secured one of Inmate Belden's ankles to the ground in an attempt to keep him from causing any further injury. Inmate Belden was finally secured in handcuffs.

[R. 38-3 at 1 (Crawford Affidavit).]

The video footage of the incident depicts Belden initially talking to Crawford and Ramey. At one point, Ramey walks away. As he walks away, Belden says something to him that causes Crawford to begin the process of putting handcuffs on Belden. At that point, Ramey walks back toward Crawford and Belden. As he approaches, Belden breaks away from Crawford, proceeding toward Ramey, and punches Ramey three times in the face. After that, the two struggle on their feet, with several more punches from Belden, until Ramey throws him to the ground. Although Belden is on top at first, two other officers help Crawford roll Belden onto his back. While on his back, Belden wraps his legs around the waist of Ramey, and the other three officers attempt to gain control of his arms. Two more officers come to help after that. At this point in the footage, officers come and go within the frame of the camera but most seem to simply stand and watch the three to four officers kneeling on the ground with Belden as they handcuff him and eventually raise him to his feet. At no point in the footage does it appear that any officer punched or kicked Belden while he was on the ground.

After Belden was successfully handcuffed and brought to his feet, Belden stated that he was "crying in distress and fear." [R. 1 at 15, ¶ 45.] Furthermore, he stated that he experienced extreme pain in his left arm and he could not see due to his eyes being swollen. [*Id.*, ¶ 46.] After inspecting Belden on May 25, 2016, Dr. Eugene Jacob diagnosed Belden with a grade 3 separation of his left shoulder. [R. 1-3 at 39 (Doctor Notes from Visit).]

On August 9, 2016, Belden filed a pro-se Complaint against several defendants, including Ramey and the responding officers who remain unidentified. [R. 1.] On July 31, 2017, Ramey filed the Motion for Summary Judgment that is currently before the Court. [R. 38.]

**STANDARD**

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When examining whether a motion for summary judgment should be granted, the court is required to resolve all ambiguities and draw all reasonable inferences against the movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "not every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). Rather, the question is whether the party who bears the burden of proof in the case has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). This means that the plaintiff must present to the court more than a mere scintilla of evidence supporting her position. *Id.* Indeed, the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *Id.*

It is not enough for a plaintiff to present speculation as to elements of the case, because "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

Finally, it should be noted that "'a verified complaint . . . satisfies the burden of the nonmovant to respond' to a motion for summary judgment, unlike 'mere allegations or denials' in unverified pleadings." *King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999) (en banc)).

**DISCUSSION**

Pursuant to 42 U.S.C. § 1983, Belden alleges two claims against Ramey: (1) excessive force under the Eighth Amendment and (2) intentional infliction of emotional distress. [R. 1 at 27.] The Court will address each claim in turn.

I.  **Excessive Force Under the Eighth Amendment**

Belden stated that Ramey engaged in excessive force when he brought Belden to the ground and held him there while multiple unidentified officers rushed the scene and struck him in the face with their knees and fists, as well as pulled and kicked his arms. [R.1 at 14-15.] Ramey disputed this account. [R. 38-2 at 2.]

"The Supreme Court . . . has held that a court may properly consider videotape evidence at the summary-judgment stage. 'When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)). The video footage of the incident does not depict officers kicking and punching Belden while Ramey held him to the ground. Thus, the Court will not adopt Belden's version of events for that portion of the altercation for purposes of ruling on Ramey's Motion for Summary Judgment.

Eighth Amendment claims by prisoners alleging excessive force must satisfy a two-prong standard. Initially, prisoners must show that the guard's actions were objectively harmful enough to create a constitutional claim. Second, the prison official's act must have been committed with the requisite state of mind. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). The first, "objective," component to the standard requires that the pain inflicted be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). "This is a 'contextual' inquiry that is 'responsive to

contemporary standards of decency.' The seriousness of the injuries are not dispositive; as the Supreme Court has held, '[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident.'" *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (quoting *Hudson,* 503 U.S. at 8–9) (internal citation omitted). While the second, "subjective," component does not have a fixed meaning, ultimately it is an analysis into the motivation of the action taken against the prisoner and if it was an "unnecessary and wanton infliction of pain." *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir.1993) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)). "[T]he question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033 (1973)).

In measuring if the force used violates the protections of the Eighth Amendment, a court may consult a number of different factors. For instance, a court might use the gravity of the injury suffered by the inmate. *Id*. Other factors a court may consider include "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id.* Finally, in reviewing a guard's actions during a prison disturbance, great deference should be paid to the "execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Combs v. Wilkinson*, 315 F.3d 548, 557 (6th Cir.2002) (quoting *Hudson*, 503 U.S. at 6).

Irrespective of whether the pain resulting from Belden's dislocated shoulder was "sufficiently serious" to satisfy the objective component,[1] the Court finds that the video footage reveals that Ramey applied force in a "good faith effort to maintain or restore discipline" under the subjective component of the excessive force analysis. *See Whitley*, 475 U.S. at 320–21; *see also Griffin*, 604 F.3d at 954. Similar to the situation at hand, the Sixth Circuit found in *Griffin* that a correctional officer had a reasonable basis to believe that force was necessary to control a pretrial detainee when video footage of the incident depicted the detainee resisting and struggling with officers. *See* 604 F.3d at 955. Specifically, the court found that the detainee did not create a genuine issue of material fact concerning her Eighth Amendment excessive force claim even though the correctional officer used a leg sweep maneuver that resulted in her breaking her tibia. *See id*. at 954-55. Here, video footage shows that Belden broke away from Crawford, punched Ramey several times, and then struggled with Raney on the ground. Eventually, other officers came to the scene and helped subdue Belden. In contrast with Belden's verified Complaint, the video does not depict any officers kicking or punching Belden while he was held down by Ramey. The Court finds that Ramey had a reasonable basis to believe that force was necessary to subdue Belden when he resisted Crawford's attempt to handcuff him and began punching Ramey. Furthermore, the amount of force used in throwing Belden to the ground and subduing him was not unreasonable considering that Belden was resisting and fighting Ramey at the time. Therefore, the Court holds that Belden has not established a dispute of material fact as to whether the force applied by Ramey was in a good faith effort to maintain or restore discipline.

---

[1] The Court notes that Ramey disputes that he was responsible for dislocating Belden's shoulder and causing Belden's black eyes. [R. 38-1 at 10.] In support, he quotes a passage from one of Belden's grievance forms in which Belden requested video footage and findings of fact regarding the incident at hand in order to determine "which correction officer vindictively hurt [his] arm and self." [R. 1-2 at 18.] Furthermore, Belden stated that his disciplinary hearing with Ramey was "unrelated" to determining the identities of these responding officers, possibly implying that Ramey did not cause his injuries. [*Id*.]

Ramey's Motion for Summary Judgement as it pertains to Belden's excessive force claim is GRANTED.

The Court notes that Belden implies in his Response that Ramey could be liable for failing to prevent the other unidentified officers from harming him. [R. 41 at 7.] As the Court has already found that the video footage of the event does not depict any officers hitting or kicking Belden while Ramey held him down, the Court denies this implied claim.

## II.     The Unidentified Officers

In his verified Compliant, Belden also makes an Eighth Amendment excessive force claim against the officers that responded to the altercation and helped Crawford and Ramey subdue and handcuff him. [R. 1 at 27.] For the same reasons explained in relation to Belden's claim against Ramey, the Court finds that Belden has not established a dispute of material fact as to whether the force applied by the responding officers was in a good faith effort to maintain or restore discipline. Even if Belden was able to identify the officers at question, the video footage depicts a scene in which the responding officers had a reasonable basis to believe that force was necessary to subdue Belden as he continued to wrestle with Ramey on the ground.

As a result, it appears to the Court that judgment in the responding officers' favor would be appropriate. Before deciding that question sua sponte, however, the Court must afford Belden an opportunity to respond if he so chooses. *See* FED. R. CIV. P. 56(f)(3); *Yashon v. Gregory*, 737 F.2d 547, 552 (6th Cir. 1984) (holding that district court must "afford the party against whom sua sponte summary judgment is to be entered ten-days notice and an adequate opportunity to respond"). Additionally, the Court notes that Belden has not served the unidentified officers listed in his Complaint within ninety days of filing the Complaint, as required by Federal Rule of Civil Procedure 4(m). Belden viewed video footage of the incident on January 11, 2018, [R. 58-

1], but did not attempt to identify or serve the officers depicted therein.  Under Rule 4(m), when a defendant has not been served within ninety days of the filing of the complaint, the Court "must dismiss the action without prejudice against that defendant or order that service be made within a specified time" unless "the plaintiff shows good cause for the failure." FED. R. CIV. P. 4(m). The Court now gives Belden such notice as required by both Rule 56(f)(3) and 4(m). IT IS HEREBY ORDERED that Plaintiff John Belden has until Friday, March 30, 2018 to file a brief addressing whether summary judgment in the unidentified, responding officers' favor is appropriate and showing good cause for his failure to serve the defendants listed as unidentified officers.

### III. Intentional Infliction of Emotional Distress

Finally, Ramey moves the Court to grant summary judgment on Belden's claim of Intentional Infliction of Emotional Distress ("IIED"). [R. 38-1 at 13-14.] In his verified Complaint, Belden averred that Ramey caused him to feel emotional distress by taunting Belden when he was upset with statements like, "Go back to Eddyville," "What a bitch," and "now thats [sic] some rat . . . shit." [R. 1 at 11, ¶ 21; 12-13, ¶ 28.]

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Childers v. Geile*, 367 S.W.3d 576, 579 (Ky. 2012). A claim for intentional infliction of emotional distress, also known as outrage, has four elements: "1. The wrongdoer's conduct must be intentional or reckless; 2. The conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; 3. There must be a causal connection between the wrongdoer's conduct and the emotional distress; and 4. The emotional distress must be severe." *Kroger Co. v. Willgruber*, 920

S.W.2d 61, 65 (Ky. 1996). In the case at hand, Ramey argues that Belden failed to establish both the second and fourth elements of an IIED claim. The Court agrees.

Pursuant to the second element, Ramey argues that even if he actually made the comments alleged by Belden, they are not sufficiently "outrageous and intolerable" to warrant a cause of action for IIED. [R. 38-1 at 13.] As Ramey cites in his Motion, the Supreme Court of Kentucky has stated: "Citizens in our society are expected to withstand petty insults, unkind words and minor indignities. Such irritations are a part of normal, every day [sic] life and constitute no legal cause of action." *Willgruber*, 920 S.W.2d at 65. The insulting comments Belden alleges Ramey made toward him are inappropriate. However, they do not rise to the level of conduct required for an IIED cause of action.

Ramey also argues that Belden has not established the fourth element because he has not established that he suffered severe emotional distress. [R. 38-1 at 13.] In fact, Belden provides little detail of the emotional distress he suffered. In his verified Complaint, Belden stated that he "reacted under the intention [sic] infliction of emotional distress caused by and created ultimately by Defendant," [R. 1 at 14, ¶ 36], but offers no other support for the distress he suffered from Ramey's alleged comments. Although Belden later stated in his verified Complaint that "[p]laintiff was crying in distress and fear" after the alleged attack by Ramey and the unidentified officers, [*Id*. at 15, ¶ 46], this does not appear to be in support of his IIED claim, which concerns Ramey's alleged comments toward Belden. Similar to the situation at hand, the Kentucky Court of Appeals held in *Kenney v. Arnold* that an inmate alleging "emotional and mental harm and pain and suffering" from inmates calling him a "rat" and "collaborator" after a correctional officer accused him of sexual harassment was not equivalent to the "extreme type of distress that creates liability for IIED." *Kenney*, No. 2006-CA-000302-MR, 2007 WL 779437, at

*3 (Ky. Ct. App. Mar. 16, 2007). Here, Belden provided even less of a description of the distress he experienced than the plaintiff in *Kenney*. Although the Court agrees with Belden that inmates should be treated with dignity and professionalism by correctional officers, he simply has not alleged the type of extreme distress required for an IIED claim.[2]

In summary, Belden has not established the second or fourth element required for an IIED claim. Thus, Ramey's Motion for Summary Judgment on Belden's IIED claim is GRANTED.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED:**

Defendant Ryan Ramey's Motion for Summary Judgment, [R. 38], is **GRANTED**. Also, Plaintiff John Belden has until **Friday, March 30, 2018** to file a brief addressing whether summary judgment in the unidentified responding officers' favor is appropriate and showing good cause for his failure to serve the defendants listed as unidentified officers.

**IT IS SO ORDERED**.

cc: Counsel of Record

John Belden, pro se
248251
Eastern Kentucky Correctional Complex
200 Road to Justice
West Liberty, KY 41472

---

[2] In acknowledgement of Belden's argument in his Response, [R. 41 at 4], the Court notes that deliberate indifference is not required as a part of the elements of an IIED claim.